UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**CV 17 - 3244**

-------------------------------------------X

LENORA KINCHEN

               Plaintiff,

     -against-

ST. JOHN'S UNIVERSITY, CONRADO "BOBBY"
GEMPESAW as President, BERNARD M. TRACEY
as Executive Vice President of Mission, KATHLEEN
MCELROY, as Senior Counsel, JOSEPH OLIVA
as General Counsel, CYNTHIA FICO SIMPSON as
Director of Human Resources Services, KATHRYN
HUTCHINSON as Vice President of Student Affairs,
DENISE HOPKINS as Executive Director of Career
Services, PAULETTE GONZALEZ as Senior Director
of Employer Relations, JANE DOE in her individual
and official capacity as employee of the NEW YORK
CITY DEPARTMENT OF FINANCE, JOHN DOE in
his individual and official capacity as employee of the
NEW YORK CITY DEPARTMENT OF FINANCE.

               Defendants,

-----------------------------------------------------------------X

**Case No.** _____



☐ **ORIGINAL**
        **BRODIE, J.**

**COMPLAINT**
        **KUO, M.J.**

RECEIVED
JUN - 1 2017
PRO SE OFFICE

*Plaintiff Demands A*
*Trial By Jury*

Plaintiff, LENORA KINCHEN, *Pro Se*, hereby complains of Defendants and respectfully

states as follows:

## PARTIES

1.     Plaintiff, LENORA KINCHEN (hereinafter "Plaintiff") is a resident of

Westchester County located in the State of New York.

2.     Defendant, ST. JOHN'S UNIVERSITY (hereinafter "SJU") is a private Roman

Catholic university located in Queens County at 8000 Utopia Parkway, Jamaica, New York. SJU

is responsible for the appointment, training, supervision, promotion and discipline of the

1

individually named defendants as indicated herein.

3.      Defendant, CONRADO "BOBBY" GEMPESAW (hereinafter "GEMPESAW")
at all times relevant is President of Defendant SJU, and at all times relevant is an employee of
Defendant SJU located in Queens County at 8000 Utopia Parkway, Jamaica, New York, 11439.

4.      Defendant, BERNARD M. TRACEY (hereinafter "TRACEY") at all times
relevant is Executive Vice President of Mission of Defendant SJU, and at all times relevant is an
employee of Defendant SJU located in Queens County at 8000 Utopia Parkway, Jamaica, New
York.

5.      Defendant, KATHLEEN MCELROY (hereinafter "MCELROY") at all times
relevant was Senior Counsel of Defendant SJU, and at all times relevant was an employee of
Defendant SJU located in Queens County at 8000 Utopia Parkway, Jamaica, New York, 11439.
Effective February 1, 2016, Defendant MCELROY is currently employed as General Counsel
also known as Chief Legal Officer at Iona College, a Roman Catholic affiliated institution
located in Westchester County at 715 North Avenue, New Rochelle, New York, 10801.

6.      Defendant, JOSEPH OLIVA (hereinafter "OLIVA") at all times relevant is
General Counsel of the Defendant SJU, and at all times relevant is an employee of the Defendant
SJU located in Queens County at 8000 Utopia Parkway, Jamaica, New York, 11439.

7.      Defendant, CYNTHIA FICO SIMPSON (hereinafter "SIMPSON") at all times
relevant is Director of Human Resources Services of Defendant SJU, and at all times relevant is
an employee of Defendant SJU located in Queens County at 8000 Utopia Parkway, Jamaica,
New York, 11439.

8.      Defendant, KATHRYN HUTCHINSON (hereinafter "HUTCHINSON") at all times relevant is Vice President of Student Affairs of Defendant SJU, and at all times relevant is an employee of Defendant SJU located in Queens County at 8000 Utopia Parkway, Jamaica, New York, 11439.

9.      Defendant, DENISE HOPKINS, (hereinafter "HOPKINS") at all times relevant was Executive Director of Career Services of Defendant SJU, and at all times relevant was an employee of Defendant SJU located in Queens County at 8000 Utopia Parkway, Jamaica, New York, 11439. Effective on or about May 2016, Defendant HOPKINS is currently employed as Vice Provost of Student Affairs at Iona College, a Roman Catholic affiliated institution located in Westchester County at 715 North Avenue, New Rochelle, New York, 10801.

10.     Defendant, PAULETTE GONZALEZ, (hereinafter "GONZALEZ") at all times relevant is Senior Director of Employer Relations of Defendant SJU, and at all times relevant is an employee of Defendant SJU located in Queens County at 8000 Utopia Parkway, Jamaica, New York, 11439.

11.     Defendants, JANE DOE and JOHN DOE, (hereinafter "DOES 1-2") actual names are unknown at this time, but at all times relevant herein were acting agents, representatives and employees of the New York City Department of Finance located in the County of New York, in the City of New York in the State of New York. Defendants JANE DOE and JOHN DOE ("DOES 1-2") are sued in their individual and official capacities.

3

## JURISDICTION AND VENUE

12.     The jurisdiction of this Court is invoked under 28 U.S.C. 1331.

13.     This Court has jurisdiction to Plaintiff's state law claims pursuant to pendant jurisdiction arising under 28 U.S.C. 1367 that are part of the same common nucleus of operative fact.

14.     Venue in this Court is proper under 28 U.S.C. 1391 in that a substantial part of the events given rise to the complaint occurred in this judicial district.

## PRELIMINARY STATEMENT

15.     This is a civil action seeking monetary relief to include past and on-going economic loss, compensatory and punitive damages, disbursements, costs and fees for violations of my rights, brought pursuant to Article 175 – New York Penal Law pursuant to Falsifying Written Statements, 18 U.S. Code § 2701 – 2711 Stored Communications Act, Electronic Communications Privacy Act of 1986 (ECPA) (as amended), 18 U.S. Code § 2510 – 2522 Wiretap Act, NY Penal Law 120.45 pursuant to Cyberstalking, Negligent Infliction of Emotional Distress, 28 U.S. Code § 4101 pursuant to Defamation, Intentional Infliction of Emotional Distress, 18 U.S. Code 241 § pursuant to Conspiracy Against Rights, and Breach of Contract pursuant to defendant SJU's internal employee policies caused intentionally, maliciously, strategically and repeatedly by the named defendants herein.

16.     Specifically, Plaintiff states that GONZALEZ, through covert and clandestine activities negligently, wantonly, recklessly, intentionally and knowingly sought to and did

wrongfully deprive Plaintiff of her right to work and perform in the position that Plaintiff was hired for as Director of Employer Relations through misrepresentation, misinformation, sabotage and character assassination. Further, Plaintiff states that GONZALEZ built an internal regime against her creating a hostile, lawless and unwelcoming workplace from the first day she arrived to present.

17.    These unlawful acts were intentional, deliberate, calculated, consistent and ongoing resulting in extreme emotional and mental suffering, the deterioration of Plaintiff's health, deprivation of promotion, loss of growth and financial increase, loss of reputation and social standing and was orchestrated to destroy Plaintiff's past, present and future opportunities.

18.    Subsequent to raising the concerns about the unlawful acts towards Plaintiff, Defendants failed to investigate, mitigate or resolve the situation causing Plaintiff to suffer further improper, unlawful and degrading acts used as a pretext to conduct an illegal termination of Plaintiff's employment. Further, it appears that Defendant SJU specifically hired GONZALEZ to target, terrorize and terminate Plaintiff.

## FACTUAL STATEMENTS

19.    Plaintiff is 46 years of age and was hired by Defendant SJU as Director of Employer Relations on or about June 10, 2013. Plaintiff held this position until March 31, 2017 when Plaintiff was illegally terminated.

20.    Plaintiff has over 20 years of professional experience in Human Capital, Recruitment, Human Resources, Career Development, Executive Search, Policy Development, Independent Consulting and Executive Leadership and Organizational Development serving in

the international, non-profit, government, educational and private sectors.

21.     Plaintiff is respected and well known in the industry and in international diplomatic circles. Plaintiff has created employment opportunities for hundreds of students and senior professionals throughout her career.

22.     Plaintiff is an Alumna of Defendant SJU holding a Bachelor's Degree in Sociology obtained in the year 2000 and holds a Certificate in International Business achieved at the SJU Rome, Italy campus. Plaintiff achieved a Master's Degree in Organizational Psychology from Columbia University in the year 2004 and holds a Certificate in Mediation and Conflict Resolution achieved from the Morton Deutsch International Center for Cooperation and Conflict Resolution at Columbia University.

23.     Prior to joining Defendant SJU, Plaintiff served in leadership positions as Senior Human Capital Consultant with Booz Allen Hamilton, Human Resources Officer with the United Nations Mission in Sudan, Director of Recruitment with Forex Capital Markets on Wall Street, Associate Dean of Student Development with Berkeley College and Assistant Director of Career Services with Skidmore College, which were all directly related to the position of Director of Employer Relations that Plaintiff held with Defendant SJU.

24.     At all times during Plaintiff's employment and to the day of the illegal termination conducted by Defendant SJU, Plaintiff performed duties in an exemplary fashion exceeding expectations set forth in the job description and consistently out-performed team members.

25.     At all times during employment, Plaintiff made an invaluable contribution to Defendant SJU by bringing prestigious employers on campus for the first time to include the

6

United Nations, World Bank, U.S. Fund for UNICEF, The White House, The Secret Service, Foreign Policy Association, U.S. State Department, Smithsonian, The Jewish Museum, Tanenbaum and many other prestigious judicial, government, non-profit and international organizations that were a direct result of the partnerships and network cultivated by Plaintiff. The caliber of employers brought into SJU to include the cultivation of existing partnerships that were dormant were never present on campus when Plaintiff attended Defendant SJU as a student.

26.      Plaintiff leveraged partnerships by creating engagement opportunities for internal stakeholders in Alumni Relations, Institutional Advancement, Admissions, Faculty, the Law School and most importantly, Plaintiff created once in a life time internship and career opportunities for students to include working in high level offices in the United Nations Headquarters, the White House, Permanent Missions and a variety of competitive organizations that were a direct result of Plaintiff's external professional network and partnerships brought into Defendant SJU.

27.      Plaintiff's exemplary performance appraisals are documented on file and Plaintiff's performance was acknowledged openly and consistently by former supervisor, Judith Courtney who resigned on or about April 2015. Judith Courtney asserted multiple times that Plaintiff out-performed team members stating and I quote "you're the only one working".

28.      On or about April 29, 2015, HOPKINS announced that Defendant GONZALEZ would be joining Career Services on or about May 26, 2015 to assume the position of Senior Director of Employer Relations at Defendant SJU replacing Judith Courtney.

29.      Defendant HOPKINS hired GONZALEZ in violation of human resources policies

in that the position was not advertised, which denied Plaintiff the opportunity to apply for the position as the most senior person on the team.

30.     GONZALEZ was hired in this senior role having no professional or educational experience in Human Resources, Employer Relations or Career Development as demonstrated in her resume. Instead, GONZALEZ'S alleged background is in banking with limited experience working in higher education.

31.     GONZALEZ was also serving in a subordinate and unrelated position as Associate Director of Development prior to joining Defendant SJU. Yet, GONZALEZ assumed a supervisory position over Plaintiff with less experience and is contradictory to GEMPESAW'S strategic goal of attracting and retaining the best talent and promoting talent within.

32.     From the first day of hire and at all times, GONZALEZ launched a well-crafted slander campaign against Plaintiff. GONZALEZ immediately built an internal regime against Plaintiff by manufacturing false allegations against Plaintiff and aggressively usurping Plaintiff's work and clients to distribute to other employees to promote them. GONZALEZ engaged in master mind manipulation, interrogation, intimidation, hostility and bullying as a means to destabilize Plaintiff. GONZALEZ neutralized all internal support that Plaintiff had through the appearance of slander, which extended outward to Plaintiff's external network.

33.     GONZALEZ did not know Plaintiff prior to joining SJU, yet GONZALEZ appeared to have a personal vendetta towards Plaintiff. GONZALEZ'S actions made Plaintiff feel as though she was being "hunted", which immediately turned Plaintiff's work environment to a workplace of extreme discomfort, terror and fear of loss of employment for no reason.

34.     Notwithstanding Plaintiff's exemplary documented record of success, GONZALEZ immediately portrayed Plaintiff as incompetent, dishonest, unethical, unprofessional, unreliable and unqualified, which was demonstrated in both libelous and slanderous communications that was shared with senior management and implied with employees, students and external clients as a means to assassinate Plaintiff's character.

35.     GONZALEZ projected her incompetence and lack of qualifications unto Plaintiff and strategically usurped Plaintiff's existence at SJU to include dismantling Plaintiff's portfolio of clients and disrupted relationships internally and externally with the pure intention to cause Plaintiff to suffer severe and unrepairable damage to reputation.

36.     Upon meeting Plaintiff for the first time, GONZALEZ stated and I quote "I can't wait to learn everything you know". Further, during the initial 1-1 meeting between GONZALEZ and Plaintiff, GONZALEZ made a comment related to contacting Plaintiff's former employers listed on Plaintiff's resume while discussing Plaintiff's background, which was inappropriate, with no basis and was an invasion of Plaintiff's privacy and a form of intimidation.

37.     Unbeknownst to Plaintiff, Plaintiff had become a target of terrorism in the workplace by an unknown source under the alleged name of GONZALEZ whose background and intentions at this time became suspicious to Plaintiff. For example, subsequent to GONZALEZ'S arrival, HOPKINS summoned the team to the conference room to inquire of who was looking into GONZALEZ'S LinkedIn page. Employees were threatened with reprimand if it was determined who researched GONZALEZ'S profile. Considering that the resume of GONZALEZ was shared with employees, the threat of reprimand came across as odd to the

team.

38.    It is noted that Donna Haynes, employee who started as a Career & Internship Advisor and was promoted within 1 year to Director of Employer Relations for the College of Professional Studies (CPS) stated and I quote, "GONZALEZ was seen around the campus long before she was hired". This made Plaintiff wonder who GONZALEZ was and why she was fixated on Plaintiff.

39.    On or about June 15, 2015, Plaintiff had taken approximately one week of vacation. Prior to departing, Plaintiff informed GONZALEZ and HOPKINS that she would not be available via email, however they could reach her via cell phone for urgent matters.

40.    Plaintiff returned from vacation on June 23, 2015 late evening and discovered that GONZALEZ sent a text at approximately 5:30pm that evening indicating that Grant Thornton, third party consultants would be in the office at 9:30am on June 24, 2015. Plaintiff received no further telephone call, information or instruction.

41.    On June 24, 2015, Plaintiff discovered that HOPKINS and GONZALEZ sent an official notification email in advance to team members the morning of June 23, 2015 with detailed instructions indicating and I quote:

6/23/15: "be fully prepared to fully engage in open dialogue about what is working well, what are gaps or challenges, and your ideas for future operation. Each Director needs to come to their individual meeting with your portfolio, which you will broadly overview with Joe and Dean. Give some thought to what you'd like to communicate so that you can do so effectively in the short amount of time available for these individual sessions".

42.    On June 24, 2015, Plaintiff inquired with HOPKINS about not receiving advanced notice via cell phone while on vacation. HOPKINS replied and I quote *"if you are on top of your game, you have nothing to worry about "*. This was an intentional and deliberate act

by GONZALEZ and HOPKINS to make Plaintiff appear less prepared than team members when meeting with Grant Thornton as evidenced in the aforementioned email of June 23, 2015.

43.     Excluding information from Plaintiff and informing Plaintiff at the last minute of important information became a pattern upon GONZALEZ'S arrival.

44.     Upon meeting with Grant Thornton the morning of June 24, 2015, Plaintiff was asked a series of questions pertaining to her work and client interaction followed by subsequent data requests made by GONZALEZ pertaining to the "timing of performing tasks". Joe and Dean, Grant Thornton consultants were very cold and calculating towards Plaintiff and used language consisting of racial epithets. For example, Joe Mulligan, Consultant made a reference to Plaintiff meeting clients "*at a water fountain*", which was completely out of context and outside the scope of how business is conducted. This statement came across with the sentiment of Jim Crow racism.

45.     It is noted that Grant Thornton came in the door with GONZALEZ and appeared to be a part of the overall scheme to "*learn everything Plaintiff knows*" with the intention to terminate Plaintiff's employment.  Plaintiff was the first Director of Employer Relations on board at SJU and the only person with substantive experience in the field.

46.     It appeared that Grant Thornton was a mechanism used to determine how Plaintiff performed her functions as a way to usurp Plaintiff's duties and distribute to other employees. This was evident based on Grant Thornton's inquiries and data request, which later assisted GONZALEZ in turning Plaintiff's work environment upside down. Whereas, Plaintiff was out-performing team mates, GONZALEZ strategized a way to put Plaintiff at the bottom by the

11

strategic removal of Plaintiff's duties, resources, support, liberties, professional development, relationships and reputation.

47.     Grant Thornton also served in a dual capacity creating a conflict of interest. Grant Thornton served as consultants to the Career Services Department and as the client of Patrick Holton, Career & Internship Advisor who was later promoted to Director of Employer Relations for the Business School. Serving in this dual capacity gave Holton an advantage. For example, Grant Thornton created performance objectives for Plaintiff and team members when this task should have been conducted by internal supervisors such as GONZALEZ and or HOPKINS.

48.     Later it became evident that Holton and other team mates were set-up for success and given more projects, while Plaintiff's projects and initiatives were being deleted or usurped and given to other employees to include employees who were in subordinate roles. Career & Internship Advisors were given Plaintiff's duties and performing the work of a Director relegating Plaintiff to a menial function. These adverse actions towards Plaintiff did not take place until after GONZALEZ came on board.

49.     These actions were done strategically and by design with the assistance of Grant Thornton and orchestrated by GONZALEZ. It appeared that Grant Thornton was running Career Services behind the scenes while aiding GONZALEZ and HOPKINS perform in their positions, with an emphasis on eliminating Plaintiff's position as Director of Employer Relations.

50.     It is also noted that the process by which the performance objectives were created for the 2015/2016 performance cycle was not in alignment with the performance appraisal policies of Defendant SJU, nor were the objectives created in the manner that former performance objectives were created prior to GONZALEZ'S arrival.

12

51.     The arrival of GONZALEZ and the denial of Plaintiff's opportunity to apply for the Senior Director position made it clear to Plaintiff's that her positive work environment was about to be turned upside down. Plaintiff was illegally terminated on March 31, 2017 based on false allegations, hear-say, sabotage and the violations identified in the subsequent causes of actions listed in this complaint.

52.     No evidence of an investigation was ever conducted. Furthermore, Defendant SJU was grossly negligent and failed to mitigate or resolve the issues Plaintiff raised. Plaintiff was in full compliance of policies and did not commit any violations and was unjustly terminated.  Yet defendants herein and other employees who openly committed violations are still gainfully employed, enjoying their right to work, gaining economic and social status with no harm to their reputation.

53.     As a direct result of said Defendant's acts, Plaintiff has suffered and continues to suffer loss of status, loss of opportunities, diminished employment, loss of income, loss of other employment benefits, depletion of retirement savings and has suffered and continues to suffer distress, humiliation, embarrassment, trauma, great financial expense and damage to her reputation.

54.     As a result of Defendant's acts, plaintiff suffered, and is entitled to damages sustained to date and continuing in excess of eleven million dollars ($11,000,000.00) as well as punitive damages, costs and attorney's fees.


## AS AND FOR THE FIRST CAUSE OF ACTION
### Article 175 – New York Penal Law

55.     Plaintiff repeats and reiterates the allegations set forth in paragraphs 1-54 inclusive of this Complaint, with the same force and effect as though herein fully set forth herein.

56.     Defendants HOPKINS and GONZALEZ violated Plaintiff's rights pursuant to Article 175 – New York Penal Law pertaining to Falsifying Written Statements. Violations were supported by Defendants SJU, GEMPESAW, TRACEY, MCELROY, OLIVA, SIMPSON and HUTCHINSON.

57.     On June 15, 2015, Plaintiff submitted performance objectives for the 2014/2015 performance cycle and completed the self-appraisal of the Partnership for Performance (PFP) form. It is noted that the objectives were created against work that Plaintiff had already accomplished considering that the objectives between the supervisor and employee was never done for this performance cycle. Since Plaintiff's former supervisor had resigned in April 2015, HOPKINS administered the performance appraisal for the 2014/2015 cycle.

58.     Upon receiving Plaintiff's self-assessment against work that was already completed, HOPKINS informed Plaintiff via email that Plaintiff should change the assessment of herself insinuating that Plaintiff has a false perception of herself. In other words, the positive remarks Plaintiff used to assess herself based on achieved results, HOPKINS suggested that Plaintiff revise or relegate her self-assessment. When Plaintiff did not revise the self-assessment, HOPKINS made a point to mention that Plaintiff did not change the self-assessment, which indicated that HOPKINS was not acknowledging Plaintiff's efforts that were already achieved and were highly visible on the campus.

59.     On or about mid July 2015, HOPKINS held a discussion with Plaintiff to review and discuss the PFP entries made thus far. GONZALEZ was present during this meeting. During

14

the discussion, HOPKINS inquired why Plaintiff was managing certain accounts such as the New York Police Department, which Plaintiff worked very closely with since the inception of her hire in 2013 and accomplished many results to include programming initiatives and the recruitment of approximately 112 Police Officers. Plaintiff established a solid relationship with NYPD leadership and its' Officers. Yet, GONZALEZ and HOPKINS aimed to transfer Plaintiff's partnership and efforts to Donna Haynes instead of requiring Haynes to build her own relationships as Plaintiff did.

60.     GONAZLEZ had also inquired in a previous discussion as to why Plaintiff was working with the veterans, when Plaintiff was the only Director who served in Sudan as an Officer with the United Nations working with similar situated personnel.  Plaintiff made a point to mention that she was open to discussing the allocation of accounts subsequent to her evaluation in an effort to stay on track with the evaluation discussion. Plaintiff noted that HOPKINS and GONZALEZ were taking the focus off of Plaintiff's achievements and instead, Defendants were searching for flaws that were not present in an effort to cause Plaintiff harm by downplaying Plaintiff's achievements resulting in economic loss and failure to promote.

61.     Subsequent to the meeting, HOPKINS and Plaintiff made several revisions to the PFP with changes indicated in red or blue ink. Upon completion of the revisions, GONZALEZ instructed Plaintiff to come to the main office on July 29, 2015 to sign the final version of the PFP. When Plaintiff arrived, HOPKINS was not present and instead went to a networking event.

62.     HOPKINS neglected to finalize and close out the final performance conversation with Plaintiff leaving GONZALEZ in charge. In accordance to the performance appraisal

63.     policies, the final assessment conversation was to take place between the Plaintiff and the supervisor to share final comments or request clarification of ratings. GONZALEZ was not employed with SJU during the 2014/2015 performance cycle and therefore was not in a position to discuss Plaintiffs performance as she was not there at the time.

64.     Plaintiff requested to reschedule the final assessment meeting for a day when HOPKINS was available. In the interim, Plaintiff asked GONZALEZ for a hard copy of the final version of the PFP for review and indicated that she would sign the document when she meets with HOPKINS.

65.     Plaintiff reviewed the final PFP that evening and discovered that the final PFP submitted on July 27, 2015 had been altered. The alterations were not cosmetic, but were material in nature. The alterations omitted or changed the essence of the words that Plaintiff used to describe her performance and took away from Plaintiff's ability to achieve the results that she already had accomplished.

66.     It is noted that GONZALEZ stated to Plaintiff and I quote "this is the final version" and gave Plaintiff the document to sign without any notification of additional changes. GONZALEZ unequivocally gave Plaintiff an altered document to sign knowing that the document had been altered, which is fraudulent behavior meant to cause Plaintiff harm on her performance appraisal, whereas Plaintiff could not rebuttal statements that she agreed upon in writing, despite the fact that there was no consent to these changes.

67.     Plaintiff notified HOPKINS immediately on July 30, 2015 indicating that her PFP had been altered subsequent to submitting the final version and that GONZALEZ made no mention of additional changes. Plaintiff expressed concern and the violation of altering her

16

68.     document indicating that she would change the altered document back to its' original form that she submitted. Plaintiff adjusted her schedule to meet with HOPKINS in an effort to review and sign the PFP together before the deadline. However, HOPKINS made it impossible for Plaintiff to meet with her and indicated that she would submit the PFP without Plaintiff's signature.

69.     Plaintiff contested the submission of her PFP without a signature, which would have indicated that Plaintiff was negligent in meeting the PFP deadline and the fact that the document submitted on time was altered by HOPKINS or GONZALEZ.

70.     In order to sign the document, Plaintiff was forced to sign the PFP in the midst of conducting a program for a client, which did not allow time for a final discussion with HOPKINS. This was done deliberately. When Plaintiff later reviewed her final PFP, HOPKINS made no comment on Plaintiff's continued successful track record and only include a statement indicating that Plaintiff can improve now that GONZALEZ, Senior Director is on board.

71.     GONZALEZ had nothing to do with Plaintiff's performance and thereby there was no basis for her name to be mentioned in Plaintiff's performance appraisal. GONZALEZ has no experience in the field on a professional or education level in comparison to Plaintiff's 20 year plus experience directly related to the field both professionally and academically. Hence, GONZALEZ was not qualified to show Plaintiff how to do the job better. Furthermore, GONZALEZ was not qualified to supervise Plaintiff, hence the back-door hiring of GONZALEZ by-passing all policies and procedures.

72.     Subsequent to receiving Plaintiff's notification of her altered PFP, HOPKINS stated and I quote, "I do not recall any changes to your PFP" thereby indicating that she did not

73.     alter Plaintiff's PFP. HOPKINS indicated that she would review the issue and get back to Plaintiff, in which HOPKINS failed to do.

74.     Moreover, HOPKINS assertion that she did not alter Plaintiff's PFP results in GONZALEZ altering Plaintiff's PFP. GONZALEZ never mentioned or admitted to altering Plaintiff's PFP and Defendants supported this violation, which caused Plaintiff to suffer a work environment where she had no rights, period. GONZALEZ had full authority to commit any unlawful act against Plaintiff with no investigation or reprimand.

75.     For the record, Plaintiff recently visited a Capital One Branch under unrelated circumstances and asked to use "white out" for a personal document. A Capital One Officer replied and I quote "The bank does not use "white-out" indicating that any errors to a document would not be deemed valid. Yet, GONZALEZ who allegedly spent the majority of her career in Capital One, intentionally did not inform Plaintiff that material changes occurred on Plaintiff's PFP after a series of revisions had occurred.

76.     This led Plaintiff to question GONZALEZ'S background whereas the act of falsifying documents or witnessing the act of falsifying written statements does not fit the profile of a former Capital One senior official.

**SUBSEQUENT INCIDENTS RELATED TO:**
**AS AND FOR THE FIRST CAUSE OF ACTION**
**Article 175 – New York Penal Law**

77.     Plaintiff repeats and reiterates the allegations set forth in paragraphs 1-76 inclusive of this Complaint, with the same force and effect as though herein fully set forth herein.

78.     Defendants violated Plaintiff's rights pursuant to subsequent incidents mentioned

herein. Violations were supported by Defendants mentioned herein.

79.     On July 29, 205, Plaintiff stood by her exemplary performance and requested an increase in salary. Other employees on the team were promoted within a year to Director positions while performing less work and during alleged hiring freezes. Upon information and belief, these employees received merit and institutional increases. Plaintiff had not received a promotion, or merit increase since 2013. In fact, Plaintiff' institutional increases that all employees are entitled to ceased upon GONZALEZ'S arrival. Yet, Plaintiff had been in full compliance with policies and out-performed her colleagues and received no increases.

80.     The act of altering Plaintiff's PFP demonstrated the intent of HOPKINS and GONZALEZ to cause Plaintiff to suffer loss of financial increase and loss of promotion. It is noted that the unlawful acts towards Plaintiff escalated subsequent to Plaintiff's request for an increase.

81.     In an effort to further relegate Plaintiff's duties and the removal of accomplishments on Plaintiff's PFP, GONZALEZ aggressively usurped Plaintiff's role as Employer Relations Liaison to student veterans and gave the duties to Daisy Saldana, who was a Career and Internship Advisor, a subordinate position than Plaintiff.

82.     Initially, GONZALEZ inquired if Plaintiff would be willing to transfer the duties of advising student veterans to Daisy Saldana, Career & Internship Advisor. Plaintiff agreed, as career advising duties was not a part of Plaintiff's job description and she had provided this service since she was the only Director on board at the time of hire and had the experience to advise the veteran population having served as a Human Resources Officer and Peacekeeper with the United Nations Mission in Sudan.

83.     Plaintiff was well qualified to service the veterans having served on the ground. Moreover, Plaintiff did not mind assisting the veterans and was dedicated to their needs, which was acknowledged by student veterans and the employers that Plaintiff collaborated with to serve the veterans. Plaintiff indicated and agreed that she would continue to oversee employer partnerships and programming activities that she had built for the veterans over the past two years, which was a milestone considering the lack of employer partnerships and new initiatives that existed prior to Plaintiff coming on board.

84.     Plaintiff agreed to collaborate with Saldana in setting up events for the veterans, but would maintain the partnerships that she built. Moreover, Saldana did not have the experience that Plaintiff had in working with veterans nor was she a Director to take over Plaintiff's accounts.

85.     Subsequent to Plaintiff's agreement, GONZALEZ held a meeting with Plaintiff, Saldana and Michelle Kyriakides, Saldana's supervisor to discuss the transition. GONZALEZ blatantly lied and falsely stated that Plaintiff agreed to handover all efforts to include programming and partnerships to Ms. Saldana. Plaintiff was put on the spot as Saldana began to ask Plaintiff for employer contacts and program information that Plaintiff had already planned months again insinuating a complete take-over of Plaintiff's work. The veterans initiatives were major achievements reflected on Plaintiff's PFP.

86.     Plaintiff requested to adjourn the meeting until a later date to reconvene with GONZALEZ, as there had been a misrepresentation of what Plaintiff agreed to. Plaintiff respectfully informed Saldana and Kyriakides that she did not want to contest in front of them as employees and would regroup after meeting again with GONZALEZ. Plaintiff made it clear to

20

87.     the employees that the agreement that was presented to them by GONZALEZ was not the terms that Plaintiff had agreed to. This amongst other deliberate acts of usurping was the strategic marginalizing of Plaintiff's work efforts as a pretext for a negative performance appraisal for 2015/2016.

88.     It is noted that Plaintiff had partnered with the U.S. Department of Veteran Affairs to create a Certifying Benefits Workshop to provide a successful transition from the military to university life ensuring that veterans were aware of their benefits with the VA. Plaintiff brought in federal agencies to facilitate Applying to Government Jobs Workshops, Resume and Interviewing Workshops and created surveys to ensure that SJU was meeting the veteran's needs.

89.     Plaintiff established an Advisory Board with the Commissioner of Veteran Affairs, the Student Veterans Association and collaborated with SJU Alumni in Washington, DC who were Vietnam Veterans and Five Star Generals to provide support to the student veterans. These initiatives were never done at SJU prior to Plaintiff coming on Board.

90.     Plaintiff established a partnership with Mary Pelkowski, Associate Dean of the Veteran Success Center to provide services to the veterans. When the Veteran Spotlight event occurred, Mary Pelkowsi confidentially stated to Plaintiff that she was told by HOPKINS to invite Saldana who at the time had contributed nothing to the veterans. Yet Saldana was present in all the photos to take credit for Plaintiff's work.

91.     It is noted that Plaintiff's very strong partnership with the U.S. Department of Veteran Affairs had dissipated without explanation. The contact stopped communicating with Plaintiff, which became a pattern upon GONZALEZ'S arrival. Chuck Taylor, President of the

Student Veterans Association also stopped communicating and distanced himself from Plaintiff without explanation, despite all documented support and praises that he previously expressed to Plaintiff. Taylor also informed Plaintiff that team members were discussing her and that he was surprised that Donna Haynes received a promotion instead of Plaintiff.

92.     Subsequent to the usurping of Plaintiff's veteran initiatives, GONZALEZ made false statements to HOPKINS alleging insubordination by Plaintiff and that Plaintiff was not following instructions to handover veteran initiatives to Saldana as agreed. GONZALEZ misrepresented Plaintiff's statements and made it appear as though Plaintiff was being combative.

93.     Plaintiff requested to meet with GONZALEZ and HOPKINS and to have Human Resources present as a neutral witness. Plaintiff was not comfortable to meet with GONZALEZ and HOPKINS alone since GONZALEZ fabricated false statements that Plaintiff did not make such as agreeing to hand over all of Plaintiff's work.

94.     When Plaintiff met with HOPKINS AND GONZALEZ, SIMPSON from Human Resources was not present. Plaintiff requested to adjourn the meeting to a time when SIMPSON could join. HOPKINS blatantly stated that SIMPSON was not coming to the meeting and that it was a management issue. SIMPSON was now taking orders from HOPKINS and GONZALEZ and had become complicit in the unlawful behavior.

95.     Based on hearsay from GONZALEZ and without any hearing or investigation, HOPKINS alleged insubordination, failure follow to follow instructions and accused Plaintiff of a host of other negative behaviors that totally defamed Plaintiff's character putting Plaintiff in a false light which was in total opposition to Plaintiff's track record, personality, character and

96.    achievements. Plaintiff was in shock and traumatized by this adverse action

considering that there was no due process or investigation of any kind. HOPKINS went on to

state several times as the Head of this Department, I have a right to do this and a right to do that,

insinuating that Plaintiff had no rights. Moreover, HOPKINS informed Plaintiff that if she did

not want to be a part of the team to let her know. Plaintiff informed HOPKINS that her

statements came across as threats.

97.    HOPKINS also informed Plaintiff that she had solicited feedback about Plaintiff

from employees and that the employees stated negative comments. Plaintiff informed HOPKINS

that she was not under investigation therefore any inquiry about Plaintiff to other employees had

no basis and therefore HOPKINS was instigating a hostile work environment towards Plaintiff

by turning employees against her. Furthermore, Plaintiff can recall during a staff meeting where

various employees openly described Plaintiff as "*Professional, Inspiring, Friendly, Mild*

*Mannered, Supportive and Focused*" in total contradiction to HOPKINS assertion.

98.    It is noted that prior to GONZALEZ'S arrival and thereafter, Plaintiff enjoyed a

cordial relationship with colleagues and always helped them to staff their events with speakers

and collaborated with teammates in getting their students jobs in the United Nations and other

sought after positions.  Only after GONZALEZ began to usurp Plaintiff's work and give it to

other employees, is when employees began to treat Plaintiff differently mostly out of fear of

losing their jobs or gaining promises from GONZALEZ.

99.    On or about August-September 2015, Plaintiff requested a meeting with

GEMPESAW, President of Defendant SJU to report the concerns and violations that were

happening to her. Having a Human Resources background, Plaintiff knew that the situation was

23

accelerating and she was being set-up for character assassination, a negative performance appraisal and eventual termination. Plaintiff was greatly concerned about the false statements being made against her and the defaming of her character and reputation. Plaintiff had never experienced an attack on her reputation and the success of her work largely depended upon her reputation in the field. More importantly, Plaintiff was concerned that GONZALEZ who did not know Plaintiff had a green light to tell lies on Plaintiff and these false statements were taken as the truth with no questions asked. Plaintiff began to feel that GONZALEZ was a danger to her.

100.   Plaintiff also informed GEMEPSAW that Human Resources was complicit and failed to address the violations. Plaintiff further described the human resources department as illegitimate. GEMPESAW conveyed Plaintiff's concerns to MCELROY, Senior Counsel at Defendant SJU. Plaintiff met with MCELROY on or about September 2015 and disclosed the same facts shared with GEMPESAW. MCELROY agreed to investigate Plaintiff's concerns.

## AS AND FOR THE SECOND CAUSE OF ACTION
### 18 U.S. Code § 2701 – 2711 Stored Communications Act, Electronic Communications Privacy Act of 1986 (ECPA) (as amended),

101.   Plaintiff repeats and reiterates the allegations set forth in paragraphs 1-100 inclusive of this Complaint, with the same force and effect as though herein fully set forth herein.

102.   Defendants violated Plaintiff's rights pursuant to 18 U.S. Code § 2701 – 2711 Stored Communications Act, Electronic Communications Privacy Act of 1986 (ECPA) (as amended). Violations were supported by Defendants mentioned herein.

24

103.    Between August 2015 and December 2015, Plaintiff was subjected to an extremely hostile work environment with the continuous usurping of clients, work projects, removal of resources to include professional memberships that Plaintiff were approved for since time of hire that benefited Plaintiff's position in obtaining career and networking opportunities for the students.

104.    GONZALEZ refused to pay for previously approved memberships for Plaintiff while approving numerous back to back conferences for subordinate staff and other directors. Plaintiff continued to suffer embarrassment, humiliation and loss of professional contacts to include the high level complimentary invitations from the Foreign Policy Association President's Office. Plaintiff would obtain complimentary entrance to the World Economic Forum where she would invite students to engage with diplomats and other Wall Street and State Department officials, which came to a halt upon GONZALEZ'S arrival.

105.    On or about December 2015, Plaintiff's was violated pursuant to 18 U.S. Code § 2701 – 2711 Stored Communications Act, Electronic Communications Privacy Act of 1986 (ECPA) (as amended). Plaintiff's computer was breached whereas all of Plaintiff's work efforts from the year 2015 were wiped clean from Plaintiff's server. Plaintiff discovered the breach while on holiday on or about December 15, 2015. Plaintiff had archived a large volume of data considering she would be out of the office for at least three weeks. Holiday greeting emails to and from clients that were recently sent and archived data and work efforts were all wiped clean from Plaintiff's server from the year 2015.

106.    Upon returning from holiday, Plaintiff reported the data breach to Information Technology. After numerous calls and emails to Information Technology, Plaintiff requested a

deeper dive with Network Administration and the emails were ironically recovered and placed back on Plaintiff's server. Information Technology stated that they did not know where Plaintiff's emails went, yet they were able to find the emails and place them back on the server. There was no explanation as to why this happened or where Plaintiff's emails went.

107.   Plaintiff reported the breach to MCELROY, Senior Counsel. However, there was no reply or explanation. During this period, emails that were shared between MCELROY and Plaintiff appeared to be intercepted while in transit, whereas Plaintiff noticed a pattern of receiving retaliatory emails from GONZALEZ every time Plaintiff was in the process of or completing an email to MCELROY. Plaintiff mentioned this pattern to MCELROY.

108.   The email communications between Plaintiff and MCELROY were stored on Plaintiff's laptop as well and were considered personal, confidential and privileged communication. At this point in time, it was a fact that someone had access to Plaintiff's computer and was sitting on Plaintiff's computer while she was on it at all times from this point forward.

109.   Plaintiff was not a subject of investigation, nor did Plaintiff or any employee receive notification of computer monitoring. When Plaintiff asked Robert Soto, Information Technology Representative if someone was on her computer, the Robert replied and I quote "*this request would require way up the chain approval*". However it was a fact that someone had granted this access, unbeknownst to me.

110.   During this period, several high level contacts stopped communication with Plaintiff out of nowhere with no explanation. These were relationships that Plaintiff had over a period of time with no problem. Upon information and belief, Plaintiff's computer was

comprised internally and her partnerships were being disrupted and behind the scenes through electronic means. There appeared to be possible keylogging or ghost log-ins occurring.

111.   Plaintiff has a list of contacts who disappeared without reason during this time causing Plaintiff to suffer further harm, fear, humiliation, loss of contacts and the continuous relegating of her position by loss of contacts and loss of movement to connect with partnerships in Washington, DC and Albany.

112.   It is noted that GONZALEZ aggressively usurped Plaintiff's trips to the Alumni Insiders View in Washington, DC and Albany by giving this Director level opportunity to William Murphy, Career & Internship Advisor, who started out as an intern. This is relative as Plaintiff could no longer trust that her clients were receiving her emails and it would have benefited her to meet them in person at the annual functions that Plaintiff was approved to attend prior to GONZALEZ arrival. Plaintiff suffered extreme humiliation as it appeared as though Plaintiff was demoted and that William Murphy had taken her position, which informally Murphy was given Plaintiff's position despite his subordinate role.

113.   The computer breach made Plaintiff feel as though she was held hostage in her role in that she no longer felt comfortable to communicate on her computer. Plaintiff strongly felt that all of her communications were being intercepted and read. Moreover, Plaintiff strongly believed that her clients were being usurped behind the scenes and she was being slandered.

114.   This clandestine activity prohibited Plaintiff from working freely as she feared that any contacts brought in would be taken and given to other employees who did not put forth the effort in building the relationship. Furthermore, Plaintiff had contact information of

diplomats who were friends and entrusted Plaintiff with their private emails. Plaintiff communicated with these parties on her email if she could create an opportunity for the students.

115.    Considering that GONZALEZ made contact with Plaintiff's clients without notifying Plaintiff, Plaintiff no longer had control over her employer portfolio and her relationships became dismantled which appeared to be GONZALEZ'S goal to cause further harm to Plaintiff, build a pretext for a negative performance, suffer loss of economic gain, humiliation and eventual termination. Plaintiff's computer was being used as a mechanism used to cause Plaintiff further harm.

## AS AND FOR THE THIRD CAUSE OF ACTION
### 18 U.S. Code § 2510 – 2522 Wiretap Act
### NY Penal Law 120.45 pursuant to Cyberstalking

116.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1-115 inclusive of this Complaint, with the same force and effect as though herein fully set forth herein.

117.    Defendants violated Plaintiff's rights pursuant to 18 U.S. Code § 2510 – 2522 Wiretap Act NY Penal Law 120.45 pursuant to Cyberstalking. Violations were supported by Defendants mentioned herein.

118.    Subsequent to Plaintiff reporting the computer breach that occurred in December 2015, Plaintiff discovered an external white wire coming into her office. The wire appeared to be a cable wire that was coming from the roof of SJU extending downward an entering into Plaintiff's office through the window. The wire was visible from the outside and invisible from the inside of Plaintiff's office.

28

119.    During this period the light in the telephone closet next to Plaintiff's office was on whereas the light was always off.  Plaintiff also experienced her cell phone data being pulled from her phone while in her office, which Plaintiff's provider verified that the phone appeared to have been cloned. Plaintiff's phone was brand new and she had just used it for the first time. The phone was fine while in the car or parking lot and only began to scramble data when she stepped foot into her office. Plaintiff filed a police report for the phone cloning and received a new phone by her provider to avoid further illegal surveillance on that device.

120.    Plaintiff reported the wire issue to facilities and was informed to report the matter to Information Technology. The Help Desk person who took Plaintiff's call was concerned and pointed out that both departments were pointing the finger at one another. Plaintiff also reported the wire to General Counsel. Subsequent to reporting the issue, a Telecommunications employee came to Plaintiff's office to view the wire. The next day, the wire was cut and there was no further mention or explanation for the wire coming into Plaintiff's office.

121.    Upon information and belief, the wire appeared to be a form of surveillance that was placed in Plaintiff's office. At this point in time, Plaintiff was not certain what was really happening or why she was being targeted or treated like a criminal.

122.    Plaintiff further discovered that email communications that were sent to GEMPESAW and copying MCELROY had been altered. This further confirmed that Plaintiff's email communications were being intercepted. Plaintiff had an expectation of privacy in this regard as these communications were personal, confidential and privileged between Plaintiff as employee and the Office of General Counsel.

29

123.    On or about January 27, 2015 around the same time that Plaintiff's cell phone appeared to be cloned while in her office, that evening Plaintiff discovered that her personal email account had been compromised. In addition, phishing emails with porn related language in the subject header was sent to former employer email addresses of Plaintiff.

124.    From December 2015 and at all times forward, Plaintiff's continued to be subjected to violations related to her technology that was never fully investigated. Defendants investigated all other technical issues and sent internal communications university wide. Yet there was no concern as to what Plaintiff was being subjected to.

125.    Plaintiff experienced further harm to include the deterioration of her health. Due to the gross negligence of Defendants, Plaintiff endured health problems and went out on FMLA on or about July 27, 2016. On July 28, 2016, Plaintiff received notification that her private email was tampered with.

126.    While Plaintiff was out on medical leave, on or about August 28, 2016, Plaintiff phoned into her voicemail to update her out of office message. Plaintiff was locked out of her voicemail and the password was changed. Plaintiff contacted the Help Desk and was informed that the password was changed and she was transferred to Telecommunications.

127.    Upon reaching Telecommunications, Plaintiff informed Jan, Telecommunications Representative that Information Technology indicated her password was changed. Jan denied this and informed Plaintiff that the password was not changed. Plaintiff called the Help Desk back to convey Jan's conflicting message regarding the password. The Help Desk transferred Plaintiff to Roy in Telecommunications. Roy verified that GONZALEZ and Cheryl Cannella had changed Plaintiff's password on or about August 24, 2016. The fact that Jan lied led Plaintiff to

believe that there was no proper authorization for GONZALEZ to have obtained and changed Plaintiff's password. This was a major violation of Plaintiff's privacy and was in violation of Defendant's Human Resources policies.

128.    Ms. Lobocarro, former Benefits Specialist who processed Plaintiff's FMLA indicated that Human Resources notifies an employee prior to changing any passwords or accessing their email. Plaintiff left two voicemails on her phone prior to departing for FMLA, which were no longer on her phone. GONZALEZ did not mention these messages when Plaintiff returned. Plaintiff has no idea who else could have contacted her.

129.    Upon learning that GONZALEZ changed Plaintiff's password, Plaintiff with the help of Telecommunications changed her password on August 28, 2016, so that Plaintiff could update her voicemail. Immediately after Plaintiff changed her password, Plaintiff was locked out again. It appeared that GONZALEZ or someone had changed Plaintiff's password a second time in violation or policies and Plaintiff's privacy.

130.    Plaintiff contacted Telecommunications again and was told to contact HR for any further instructions. Plaintiff was out on medical leave and was treated as though she was out for disciplinary actions. Defendants were allowing GONZALEZ to completely take over Plaintiffs life both professionally and personally in that an employee has a reasonable expectation of privacy.  GONZALEZ had overstepped all boundaries, policies and the law when it came to Plaintiff.

131.    Plaintiff also experienced denied access on her laptop while out on medical leave. Upon returning from FMLA in October, there was a "call forwarding" mechanism on Plaintiff's office phone that did not allow her to access the voicemail to remove this mechanism. Plaintiff

31

informed Telecommunications and they did not recognize the mechanism and made reference to the device or mechanism being external. Telecommunications had to manually remove the mechanism from Plaintiff's phone. When Plaintiff looked up the mechanism on Google, it appeared to be an external system that allowed a person to forward the extension to any phone at any time.

132.   GONZALEZ had usurped Plaintiff's right to access her phone while on FMLA. Plaintiff was also informed by the New York Emergency Management Agency that her extension was coming up with a different exchange from Defendants SJU'S number. This was only occurring from Plaintiff's phone, as she contacted the client from a different extension and the exchange came up normal.

133.   Plaintiff also discovered a series of porn related emails in her spam box. Plaintiff reported these emails to Information Technology and there was no sound of alarm. Information Technology mentioned that a cell phone or blackberry could have been involved. Plaintiff reminded Information Technology that she does not use her phone or engage any of her private technology with SJU's servers considering their inability to identify the various breaches.

134.   Plaintiff was surprised that porn related emails would bypass firewalls in an institution. The types of porn emails on Plaintiff's computer are normally downloaded in error on personal computers and only if the person is entering those types of sites, in which the Plaintiff was not. Plaintiff pointed out that if Information Technology was unable to identify how these emails were getting on Plaintiff's server, how would they know if porn emails were not going out from Plaintiff's server? There was absolutely no explanation provided.

135.    From December 15, 2015 and at all times, Plaintiff continued to experience major issues on her computer to include emails opening up by themselves, computer switching screens while Plaintiff was in the midst of drafting emails and other glitches that were well documented.

136.    Plaintiff also experienced computer issues with CareerLink, the database that stores client relationship data. Plaintiff also noticed a pattern of GONZALEZ mentioning comments or making references to statements that Plaintiff made on a call, which connotes eavesdropping by GONZALEZ who was the subject of an investigation in the Office of General Counsel. Yet, no investigation took place to Plaintiff's knowledge.

137.    When Plaintiff was illegally terminated on March 31, 2017, SIMPSON alleged that she was giving Plaintiff's computer to Information Technology. As of April 10, 2017, Information Technology had no idea that Plaintiff was no longer with SJU. Per Plaintiff's call with Robert Soto on April 10, 2017, Robert stated and I quote "I'm sorry to hear this, I had no idea you were no longer here". As of April 10, 2017, Plaintiff's email address was still activated. Plaintiff informed Soto that clients had indicated that her email was still on. Plaintiff requested immediate deactivation of her email. This proves that SIMPSON did not turn Plaintiff's laptop into Information Technology.

138.    Upon information and belief, Plaintiff believes that GONZALEZ has her laptop to date. Despite Soto alleged deactivation of Plaintiff's email address on April 10, 2017, a client notified Plaintiff that her email was still activated on or about April 21, 2017. Not only was Plaintiff's email address still on, but Plaintiff's email is sending out a message indicating that she is no longer employed by the University along with other language that puts Plaintiff in a false light.

33

139.   The fact that Defendants still have Plaintiff's email address active, Plaintiff remains vulnerable to malicious attacks and further character assassination, whereby the person who has possession of Plaintiff's email address could send out illegal content or content that does not reflect Plaintiff in a positive light and Plaintiff has no way of stopping this. Plaintiff has already requested Defendants to turn off her email address. However, someone has granted authority to keep it open and most likely GONZALEZ has full access.

140.   Plaintiff has suffered and continues to suffer extreme humiliation, embarrassment and loss of professional standing. The message on Plaintiff's email is derogatory sending a negative message that implies that Defendant committed a false act in that the Defendants would not allow her to turn off her own email. Moreover, the email shows that Plaintiff is sending out negative communication about herself when she is no longer there. Plaintiff is mortified of this malicious, intentional and deliberate act. At this stage in Plaintiff's career, this damage to Plaintiff's reputation is detrimental to her gaining new employment opportunities.

141.   GONZALEZ was very cunning in the way she falsely portrayed Plaintiff using deception and manipulation by way of mixing falsehood with an ounce of positive truth to remove any doubt coming from her.

142.   Plaintiff consulted with a private investigator in an attempt to identify the source of GONZALEZ'S unlawful behavior towards Plaintiff and why Defendants were being negligent in stopping the violations. The private investigator agreed to assist Plaintiff and then disappeared in the same pattern as all others who have shown support to Plaintiff. The investigator made a comment related to Defendant SJU stating that Catholic institutions are run by the Vatican and is a hidden hand that controls the world. With that the investigator disappeared leaving Plaintiff to

34

wonder what the Vatican and the rest of the said comment had to do with Plaintiff.

## AS AND FOR THE FOURTH CAUSE OF ACTION
### Negligent Infliction of Emotional Distress

143.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1-142 inclusive of this Complaint, with the same force and effect as though herein fully set forth herein.

144.    Defendants violated Plaintiff's rights pursuant to Negligent Infliction of Emotional Distress. Violations were supported by Defendants mentioned herein.

145.    Plaintiff reported violations to MCELROY, Senior General Counsel on or about September 2015. MCELROY sat on the complaint for four months with no evidence of investigation or follow-up. Plaintiff contacted MCELROY in January 2016 and MCELROY informed Plaintiff that she had resigned and the approximate date of January 15, 2016 would be MCELROY'S last day of employment with Defendant SJU.

146.    When Plaintiff met with MCELROY prior to her departure, she indicated that she investigated and there was no evidence of discrimination. Plaintiff informed MCELROY that at no time did she raise a complaint of discrimination. Plaintiff reiterated the various violations and requested resolve and an investigation. MCELROY offered no further information. However MCELROY did confide in Plaintiff by stating and I quote " *the things that I have seen over the past year at SJU made me sick to my stomach"*.

147.    MCELROY referred Plaintiff to OLIVA, General Counsel for further counsel and information on the concerns raised.

148.    Plaintiff followed up with OLIVA in January 2016 and met with him on several occasions to discuss the concerns. OLIVA initially appeared interested in resolving the issue and

35

even supported Plaintiff moving to another department at the Plaintiff's request. Plaintiff and OLIVA discussed in a confidential manner that Plaintiff would transfer to Institutional Advancement or Alumni Relations and would also provide support to the President. Plaintiff was relieved and looked forward to the transfer.

149.   For an unknown reason, the transfer was delayed for months without explanation while Plaintiff continued to suffer further harm under GONZALEZ. On May 3, 2016, Plaintiff met with OLIVA and provided a written document with eighteen violations that Plaintiff requested explanation of and a proper investigation since MCELROY avoided the issues and resigned.

150.   OLIVA and Plaintiff held an approximate four hour discussion ending with OLIVA agreeing to investigate, mitigate, and transfer Plaintiff to another department. At the same time when discussing the issues, OLIVA made a clear and definitive statement and I quote *"wer're not firing GONZALEZ"*. Plaintiff was taken aback by this statement and OLIVA'S allegiance to an employee who has committed numerous violations against Plaintiff.

151.   Subsequent to the meeting, OLIVA and GEMPESAW reneged on all agreements. In accordance to the policies, Defendant SJU had a duty to investigate Plaintiff's claim. Defendants did not fail to investigate every other claim involving violations of policies, which was evidenced by internal communications.

152.   Despite Plaintiff's plea for over two years and Plaintiff's written notifications to OLIVA and GEMPESAW indicating that the violations were grossly affecting Plaintiff's health, said Defendants ignored Plaintiff's letters and did not respond.

153.    Said Defendants reneged on the transfer and failed to mitigate the situation by transferring Plaintiff to work with the President and Institutional Advancement as promised.

154.    When discussing the altering of Plaintiff's PFP, OLIVA made excuses for both HOPKINS and GONZALEZ and indicated that best practices would be implemented in human resources. SIMPSON'S violations in Human Resources were also overlooked. OLIVA did not institute best practices, as another employee Dominique Torres was promoted from Director of Compensation and again to Executive Director without advertising the position. The second promotion was subsequent to Plaintiff's complaint, hence there were no best practices employed.

155.    When discussing the data breaches, wires and other technical breaches, OLIVA stated and I quote "*I used to think there was an electronic footprint too until I came to St. Johns*". The breaches were never investigated. OLIVA reneged on his request to review the emails that appeared to be altered by MCELROY, Senior General Counsel. OLIVA also appeared to use intimidation tactics to discourage Plaintiff by asserting that the Chair of Grant Thornton and a judge were deacons or friends of his church. There was no basis of sharing this information with Plaintiff other than to cause intimidation.

156.    OLIVA and GEMPESAW allowed GONZALEZ to interfere with Plaintiff's transfer when the transfer was supposed to remain confidential. OLIVA terminated the new Institutional Advancement Director, Christian who Plaintiff would have reported to instead of terminating GONZALEZ for intercepting the transfer. OLIVA allowed GONZALEZ to repeatedly exclude Plaintiff from employer relations meetings when she was instructed by OLIVA to include Plaintiff.

37

157.   Defendants allowed GONZALEZ to skip over the 2015/2016 Performance Cycle to avoid dealing with the fact that she or HOPKINS would have had to be held accountable for altering Plaintiff's PFP. Giving GONZALEZ the right to skip over a performance cycle was in violation of policies and denied Plaintiff the right to an entitled institutional increase. Plaintiff did not violate any policies and yet did not receive an increase. Yet, GONZALEZ, SIMPSON and all other parties received their institutional increases. This is evident by their promotions and increased authority.

158.   Defendants engaged in a concerted effort to use discrimination as a pretext when Plaintiff never raised the issue of discrimination. This was evident by the constant focus on "Black" initiatives all of a sudden and the strategic installment of a women of color to head the Human Resources Department as Chief Diversity Officer. These tactics were quite visible considering SJU's Jim Crow practices of the past and present. Moreover, the installment of the Chief Diversity Officer had no effect as the policies and procedures were steadily being violated in Human Resources, despite her presence. She was just a figure head.

159.   This discrimination pretext was also evident by GONZALEZ paying special attention to Cheresa Fewall to build the pretext of "treating of women of color" nice, so they would not be accused of discrimination. This tactic was used to play one person of color against the other, which is a known historical Jim Crow practice.

160.   This discrimination pretext does not apply, as Plaintiff did not at any time raise a discrimination complaint. In fact, Defendants consistently pushed Plaintiff to speak with the EEO officer who had already violated every policy in the book. If EEO laws were followed, the Senior Director of Employer Relations position and Dominique's position would have been

38

advertised and GONZALEZ would not have been hired in her current position.

161.    It appears that GEMPESAW was using his nationality and GONZALEZ nationality to their advantage to conduct these violations and hide behind the race card that Plaintiff never pulled. These violations towards Plaintiff were criminal in nature and were in violation of policies and laws and needed to be investigated on the face of the violation. It is also noted that the below employees all allegedly resigned or were allegedly pushed out for unknown reasons under GEMPESAW'S leadership or within the same timespan that these violations were occurring to Plaintiff, which verifies that employees from all different backgrounds raised issues or witnessed violations.

- Andrea Yenco
- Mia Vaz
- Mary Harper Hagen
- Sara Honen Leopp
- Monica Curti
- Katie White
- Joan Vivian
- Tom Garlard
- Laura Lobaccaro
- April Meranda
- Ben Rotberg
- Scott – Institutional Advancement
- Elisa – Alumni Relations
- Andrew – Student Affairs
- Susan Henderson
- Judy Courtney
- Christina Villacis
- Dominic
- Jan – Telecommunications
- A. Munoz
- Christian – Institutional Advancement

162.    Defendants had a duty to investigate and resolve the issues that Plaintiff raised in accordance with SJU'S policies and procedures.  Especially considering the evidence that

Plaintiff shared directly with GEMPESAW, MCELROY and OLIVA. Plaintiff also raised the issue to TRACEY and sought his help as the Executive Vice President and next in line to GEMPESAW. TRACEY did absolutely nothing, yet he stands for the Vincentian mission and values of SJU and had no problem with the Defendants violating the Plaintiff with such hypocrisy. Moreover, violating an Alumna with such hypocrisy.

163.    HUTCHINSON allowed GONZALEZ to terminate Plaintiff despite Plaintiff's successful track record with no violations on file. Moreover, HUTCHINSON hired Plaintiff and allowed GONZALEZ who was not even the head of the department to terminate Plaintiff with no explanation, no written warnings or cause.

164.    GONZALEZ did not hire Plaintiff and had no authority to terminate Plaintiff. It is noted that April Meranda was allegedly terminated for violation of policies and was hired back to SJU by OLIVA, General Counsel. Yet, Plaintiff violated no policies and performed exemplary service to SJU and was illegally terminated in violation of the law and without cause.

165.    Soraya, Benefits Coordinator who took over Plaintiff's FMLA process was allegedly on probation and recommended for termination by the former head of Human Resources since 2016. Soraya did not handle Plaintiff's FMLA properly and lied about her actions and allegedly made numerous violations to include allegedly over paying an employee $60K, which was not corrected allegedly. Yet Soraya is still comfortably in her role. These are two examples of many employees who actually violated policies and are still employed.

166.    Defendants breached their agreement to mitigate, investigate and transfer Plaintiff as promised without explanation causing Plaintiff further harm. OLIVA specifically allowed GONZALEZ to answer on behalf of the Office of General Counsel and put an end to the

40

investigation that never started. GONZALEZ had the audacity to copy General Counsel appearing to be completely lawless in her actions having no respect for a legal process and investigation. OLIVA subsequently sent Plaintiff an email threatening her employment if she did not resume meeting with GONZALEZ.

167.    Plaintiff claims damages in the form of personal injury and physical damages in that Plaintiff's health deteriorated causing Plaintiff to go on medication resulting in a change of lifestyle.

168.    Plaintiff claims damages of emotional distress for having suffered and continues to suffer loss of reputation, employment, social standing, professional growth and promotion.

169.    Plaintiff claims damages of having suffered financial increase from loss of promotions, institutional increases, front and back pay, loss of retirement savings.

### AS AND FOR THE FIFTH CAUSE OF ACTION
### 28 U.S. Code § 4101 pursuant to Defamation

170.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1-169 inclusive of this Complaint, with the same force and effect as though herein fully set forth herein.

171.    Defendants violated Plaintiff's rights pursuant to Defamation. Violations were supported by Defendants mentioned herein.

172.    At all times, GONZALEZ defamed Plaintiff's character in libelous and slanderous acts by insinuating and making statements that reflected Plaintiff in a false light that was in total opposition to Plaintiff's work ethics, reputation, experience, education and proven track records. GONZALEZ consistently undermined accused Plaintiff of violating policies or braking the rules. GONZALEZ defamed Plaintiff by quoting the Vincentian values to Plaintiff

insinuating that Plaintiff did not know, respect or follow the principles of love, respect, trust and other humanitarian norms. GONZALEZ repeatedly made libelous comments insinuating that Plaintiff was a liar and irresponsible worker.

173.    GONZALEZ shared this communication with General Counsel and leadership on more than one occasion painting Plaintiff in a false light completely and absolutely defaming Plaintiff's name and everything that Plaintiff stands for. GONZALEZ was projecting her personality onto the Plaintiff. HOPKINS also supported and engaged in defaming Plaintiff in libelous and slanderous acts such as slandering me to employees, which she admitted to during the former meeting.

174.    GONZALEZ repeatedly and consistently through libelous and slanderous acts attempted to make Plaintiff appear incompetent when she is the unqualified person in her position.

175.    GONZALEZ is still defaming Plaintiff by using Plaintiff's email to communicate negative messaging to make Plaintiff appear in a false light with employer clients.

176.    Plaintiff has suffered and continues to suffer loss of reputation, relationships and opportunities for future employment. Plaintiff is consistently asked why she is unemployed with such credentials. The Department of Labor even made mention that they were surprised a person with Plaintiff's credentials was unemployed in today's market. The Department of Labor Unemployment Office stated that the latest trends were that employers were hiring employees with specific skills, thereby the counselor was surprised that Plaintiff having the direct experience in her position was yet facing unemployment.

177. When Plaintiff was out on FMLA due to the constant harassment and violations towards Plaintiff, GONZALEZ did not inform employees of Plaintiff medical leave for at least 30 days in accordance to several colleagues. Plaintiff's FMLA was referred to by clients, employees and students as "you were gone", which is the message that GONZALEZ conveyed as she was the only person who was aware of Plaintiff's FMLA as Plaintiff notified her in accordance to the policies.

178. Upon Plaintiff's first day back from FMLA, a colleague Matthew Furnari asked Plaintiff in a jokingly manner "are you coming back" when Plaintiff left the staff meeting. Plaintiff was highly insulted as GONZALEZ'S messages made plaintiff appear as though she engaged in job abandonment or was out on disciplinary action.

179. In contrast to this negative behavior, Patrick Holton was out on FMLA and his clients was aware he was on sick leave, his client relationships stayed intact, employees were aware of his FMLA and he returned back to his same position. Moreover, Patrick was promoted to Director during a hiring freeze and despite working half the year.

180. Plaintiff's employer portfolio was completely dismantled upon her return from FMLA. GONZALEZ had taken William Murphy Career and Internship Advisor on client visits to Plaintiff's clients with the impression that Plaintiff *"was gone"* and Murphy had taken Plaintiff's position, which is in violation of federal FMLA law that dictates that Plaintiff is to return to the same or equivalent position.

181. It was proven that GONZALEZ had defamed Plaintiff with Kelly Roberts of NAFSA, who was one of Plaintiffs platinum level partners and a professional external contact. Plaintiff had an exemplary relationship with Roberts and placed a student every year in the

43

Youth Ambassador to the United Nations internship with NAFSA.

182.    Upon returning from FMLA, Roberts demeanor towards Plaintiff had completely changed and when Plaintiff contacted Roberts, she was cold, rude and accused Plaintiff of not talking to her colleagues, GONZALEZ and Murphy. Plaintiff had taken students to the United Nations to attend an event with Roberts on or about November 2016, and Roberts yelled at Plaintiff in an accusatory manner while at the United Nations where the students could see.

183.    Plaintiff was shocked by Robert's unprofessional conduct based on fabrications obviously alleged by GONZALEZ. It was clear through Roberts communication that GONZALEZ and Murphy had taken over the account and Roberts admitted to being confused as to whom to contact based on her meeting with GONZALEZ and Murphy. It is noted that students were not hired in Plaintiff's absence and after GONZALEZ and Murphy interfered with Plaintiff's client relationship.

184.    This was the pattern upon returning to work from FMLA. Clients were asking *"are you still working"* giving Plaintiff the impression that she was out on disciplinary action. No one knew that Plaintiff was on sick leave. Maria, employee from the Staten Island campus confided in Plaintiff and stated and I quote *"Murphy and other colleagues were irritated that you returned from FMLA, personnel changes had to be made because you were not supposed to come back"*. GONZALEZ set Murphy up to take Plaintiff's position as Director of Employer Relations. Maria further stated that *"Jocelyn her supervisor stated that Murphy and other SJC employees did not like Plaintiff"*.

185.    This was a result of GONZALEZ'S undoing of Plaintiff's reputation and relationship with employees.

44

186.    A student also shared with Plaintiff that they sensed a form of sabotage to Plaintiffs email and it appeared that she was not coming back while on medical leave. This student shared an email with Plaintiff that proved that someone was on Plaintiff's computer.

187.    Plaintiff faces moment to moment humiliation knowing that she did nothing wrong and yet her career, finances, social standing, opportunities, reputation were loss due to violations that defendants inflicted upon her for no reason.

### AS AND FOR THE SIXTH CAUSE OF ACTION
### 18 U.S. Code 241 § pursuant to Conspiracy Against Rights

188.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1-187 inclusive of this Complaint, with the same force and effect as though herein fully set forth herein.

189.    Defendants violated Plaintiff's rights pursuant to 18 U.S. Code 241 § pursuant to Conspiracy Against Rights. Defendants conspired to oppress, threaten and intimidate Plaintiff with the intention of terminating Plaintiff's employment.

190.    Defendants violated Plaintiff's confidentiality by allowing the violations against Plaintiff to spread internally and externally causing Plaintiff further harm and damage to reputation. Certain employees approached Plaintiff and appeared to be informants. A faculty member voluntarily informed Plaintiff of Defendant SJU paying faculty members overtime in the amount of 7 hours which equates to $40,000.00 plus without reporting the income or reporting it as gifts. The faculty member went on to state "*that the Defendant is like a family. He went on to state and I quote, it's best to put your head down and every now and then they give you a little something to take care of you*". He alleged that OLIVA makes $500,000.00 annually and the Defendant SJU is ran by a bunch of lawyers.

45

191.    The faculty member further stated that Defendant SJU only recruits students of color to seek federal funding. Plaintiff did not comment, but just listened wondering why this information was being fed to her.

192.    Another employee approached Plaintiff voluntarily and shared a note from a disgruntled employee who referred to Defendant as a "mafia" and he was going to the media with his story. Subsequent to these encounters, both employees changed their position towards Plaintiff as if they approached her only to gain information. In other words to provoke Plaintiff to speak negatively about Defendant.

193.    Plaintiff also applied to a position in the Law School, which she was capable of performing and was humiliated during that process. Plaintiff was called for an interview, however it was evident that the Law School employees were aware of issues and only interviewed Plaintiff for formality. One of the interviewers attempted to undermine Plaintiff and talk down to her as if she was incompetent when asked a particular question. Plaintiff responded with experience, however the interviewer had less educational credentials than Plaintiff and attempted to turn the table on Plaintiff as if Plaintiff lacked qualifications. This interviewer was an Assistant Dean running the law school and did not possess an advanced degree. Yet she looked down on Plaintiff.

194.    Every person that Plaintiff had a relationship with internally, the person distanced themselves or Defendants would create a scenario where the person would be immediately seen with them and then no longer communicate with Plaintiff. For example, Plaintiff had a very good relationship with an Alumni Ed Geiger in Washington, DC. Ed met Plaintiff in her position as Director almost four years ago. Suddenly Geiger sent Plaintiff an email asking if GONZALEZ

46

was her boss with several question marks.

195.    The next year, GEMPESAW met with Geiger and all of a sudden Geiger no longer remembers Plaintiff's title and congratulates her on a promotion that she never received. This gave Plaintiff the impression that she was being discussed and Geiger's comment was suspect considering Plaintiff's title never changed on her email nor did Plaintiff notify Geiger of any changes. Geiger is a former intelligence agent and it is highly doubtful that he would miss a detail.  Geiger no longer communicates with Plaintiff like before. This was an increasing pattern with Plaintiff's contacts disappearing which appears to be conspiratorial.

196.    When Plaintiff was on FMLA, a brown envelope was sent to Plaintiff's home address with no name only to include Career Services. When Plaintiff questioned SIMPSON about giving out her home address to employees, SIMPSON responded and I quote, I do not need your consent to give out your address, which was a gross violation of Plaintiff's privacy and indicated a lack of competence on SIMPSON's part.

197.    It was evident to Plaintiff that the entire university from employees, to students, to faculty were involved or had knowledge of what was happening to Plaintiff. This invoked anxiety, stress, fear and humiliation with Plaintiff.


## AS AND FOR THE SEVENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

198.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1-197 inclusive of this Complaint, with the same force and effect as though herein fully set forth herein.

199.    Defendants violated Plaintiff's rights pursuant to Intentional Infliction of Emotional Distress.

200.    Defendants actions towards Plaintiff at all times was malicious, intentional with the deliberate intent to inflict harm on the Plaintiff. GONZALEZ specifically was cold and calculating in her unlawful actions and she enjoyed assassinating Plaintiff's character and destroying Plaintiff's existence at SJU.

201.    GONZALEZ never acknowledged that her actions were making Plaintiff physically ill even when notified and she never acknowledged that she did any wrong doings to Plaintiff. GONZALEZ actions were sadistic and diabolical nature, in that she consistently tried to appear as though she was the victim on paper or appear friendly when she was steadily dismantling Plaintiff's duties behind the scene with the help of employees and the support of said Defendants.

202.    GONZALEZ turned anyone she could against Plaintiff and even stated that Judith Courtney, Plaintiff's former supervisor would not agree that Plaintiff was an exemplary worker. Plaintiff did not entertain this statement as Courtney was not present to defend herself and Plaintiff has two very positive performance appraisals on file from Courtney that would counter her lies and defaming false statements. GONZALEZ enjoyed undermining Plaintiff with the intent to drive Plaintiff out and to make her physically ill since she was aware of her health issue caused by her conduct.

203.    GONZALEZ also removed all of Plaintiff resources and blatantly made false allegations about policies. For example, Plaintiff worked from home on Mondays to catch up on data. GONZALEZ removed that privilege indicating that it was against company policy. Meanwhile Karen Acampado, Career and Internship Advisor continued to work from home. GONZALEZ made an issue about Plaintiff's vacation time sending the notice to HUTCHINSON

48

insinuating that Plaintiff lacked the ability to plan vacations properly to support the department.

204.    GONZALEZ reduced Plaintiff to a child-like state or a minor who had no knowledge and needed to be led, when Plaintiff was outperforming colleagues with no supervision.

205.    Other times when it was convenient, GONZALEZ would blame and accuse Plaintiff of not making a decision about something. When GONZALEZ'S spouse passed away, she took approximately 1 week off and came right back to work terrorizing Plaintiff on a daily basis behind the scenes through covert activity.

206.    Plaintiff would experience the subliminal removal of her work, relationships and reputation on a daily basis through covert activities. HUTCHINSON supported this behavior and also threatened Plaintiff to resume contact with GONZALEZ. When Plaintiff took off for jury duty, despite GONZALEZ having access to Plaintiff's calendar, GONZALEZ sent several emails copying HUTCHINSON insinuating that Plaintiff was missing and that she was worried, when her actions clearly showed she could care less about Plaintiff. Furthermore, it was not normal policy for employees to call supervisors daily when on jury duty and the schedule was clearly Plaintiff's visible calendar. GONZALEZ had engaged Plaintiff in an abusive and sick relationship that Plaintiff wanted no part of, but was forced to endure due to Defendants refusal to act.

207.    GONZALEZ eliminated the Non-Profit & Government Career Fair that Plaintiff built from the ground up hosting high level employers from the federal, city and state to include Washington, DC federal agencies, international organizations, museums and non-profits.

49

208.   GONZALEZ and other employees were taking Plaintiff's employers to staff their fairs. Joni O'Hagan and Donna Haynes were practically begging Plaintiff for employers to staff their career fairs, while they were all a part of eliminating Plaintiff's major career fair. The loss of conducting the fair was a major hit to Plaintiff's expected results and was a pretext for a negative performance appraisal.

209.   On or about March 6, 2017, Plaintiff went to the doctor for a follow-up exam and an EKG. Plaintiff's physician wanted to immediately admit her to the emergency due to her blood pressure readings, which were triple digits on both ends. Plaintiff informed her physician that she would be more worried if she went into the hospital as GONZALEZ would most certainly usurp her planned programs and clients. Plaintiff was trying to maintain her employment and did not want to disappoint the students and clients. Instead Plaintiff went home with additional medication and instructions from Physician.

210.   Plaintiff's Physician contacted her again via telephone as he was worried about her condition. Defendants did not care and accelerated their conduct towards Plaintiff. They were aware of her health as Plaintiff informed GONZALEZ and defendants that she was not to be exposed to any intentional stress or harassment. The harassment and hostility continued. GONZALEZ consistently engaged in acts of giving other employees awards and benefits despite their begging Plaintiff for her clients. Donna Haynes received an award for best Executive and the same day was begging Plaintiff for clients. Matthew Furnari also needed a task force drawn up to help him facilitate his program. Plaintiff out performed her colleagues once again with the level of clientele and number of employers with no help or support from colleagues, nor did Plaintiff seek help. She just did her job and the work required to do it. Plaintiff received no

awards, recognition, respect or increase. Murphy also received multiple awards, conferences and the Director duties of Plaintiff. Yet, Murphy admitted on several occasions in front of Plaintiff that he did not have to do any work for his programs. The faculty did the work and all he had to do was show up. These were Murphy's words.

211.    When GONZALEZ knew that Plaintiff was not going to quit, she staged a final sabotaging act involving external clients and employees to build a pretext to terminate Plaintiff. These acts included someone inviting DOES 1-2 from the NYC Department of Finance to attend an invite only Industry Night event for the Non-Profit, Government and International agencies that Plaintiff was hosting. GONZALEZ only afforded Plaintiff with a budget that would allow literally 1 water and 1 snack per person which was totally embarrassing to Plaintiff and was not customary. Plaintiff turned the uninvited guests away as the event required registration. GONZALEZ reprimanded Plaintiff for not letting uninvited guests into her event instead of focusing on the fact that Plaintiff had the most successful event and the students and clients were so pleased. GONZALEZ also falsely accused Plaintiff of exceeding the budget as a pretext.

212.    Plaintiff held five excellent programs upon returning from FMLA, which all were well attended and first time events. Students, faculty and clients were well pleased. These events included a Global Peace and Security Dinner, hosting Tanenbaum's CEO and guests, a keynote and Peacemaker from South Africa, a UN Representative and a Professor and Expert on the Palestinian and Israeli relationship, a Faculty Site Visit with the FDA and their top Scientists and Director of Chemistry, a site visit for students and faculty to the Jamaica Bay Wildlife Refuge and a Corporate Presentation with Enterprise Corporation in collaboration with student clubs. Every event was well attended.

213.   During Plaintiffs last 1-1 meeting with GONZALEZ, Plaintiff asked to discuss her recent achievements and GONZALEZ stated no. She wanted to focus on the negative aspects which included uninvited guests who showed up uninvited with intentions to set Plaintiff up. In addition, Murphy had recently informed Plaintiff that GONZALEZ had sent him a photo of Plaintiff at the Global Peace Dinner via text. Plaintiff asked GONZALEZ who took the photo to send to her via text, as GONZALEZ was not present at the event.

214.   GONZALEZ stated that Mansoor Khan took the picture. Plaintiff contacted Mansoor and inquired of the alleged action of taking Plaintiff's photo and requested that if it were true, not to do so in the future without her consent. Khan responded and thanked Plaintiff for using the word alleged. Khan denied taking the photo and wished Plaintiff a good weekend. GONZALEZ sent another libelous email accusing Plaintiff of being rude to Khan and disrespecting employees, not following instructions and other defamatory false statements. Plaintiff did not debate as Plaintiff has written evidence from Khan.

215.   GONZALEZ informed Plaintiff that she had no right or authority to stop anyone from taking her photo. Plaintiff informed GONZALEZ that she had no problem with SJU'S professional photographer taking photos of her. However, she did have a right to contest individuals taking photos of her with their cell phone and sharing her photo from cell phone to cell phone without her permission. GONZALEZ never did disclose who sent her Plaintiff's photo that she forwarded to Murphy's cell phone, as Khan denied sending it.

216.   On March 31, 2017, GONZALEZ summoned Plaintiff to human resources with no explanation. Plaintiff responded by inquiring of the basis of her appearance and informed

52

GONZALEZ that Human Resources had not notified Plaintiff of any request to come to Human Resources. Upon receiving notification from Human Resources, Plaintiff stated she would oblige.

217.    GONZALEZ responded by indicating that she and SIMPSON had a few things to discuss with Plaintiff. Plaintiff remained in her office awaiting notification from SIMPSON. Within the next few minutes, GONZALEZ, SIMPSON and two Public Safety Officers came to Plaintiffs office. With the door open and students and employees present, GONZALEZ and SIMPSON walked into Plaintiffs office and stated "you did not come to us so we came to you". GONZALEZ stated "you are terminated" and left Plaintiff's Office.

218.    Plaintiff requested that they sit down and close the door to give Plaintiff privacy. However GONZALEZ left and SIMPSON refused to sit down. Public Safety was waiting outside Plaintiffs door by the receptionist. Plaintiff inquired as to why she was being terminated and SIMPSON stated "*I am not getting into this with you*". *Your behavior and performance is why*". This was a complete fabrication as it is a known fact that Plaintiff was the top performer in her department from time of hire to present.

219.    Plaintiff had no violations on file whatsoever. SIMPSON and GONZALEZ had the audacity to accuse Plaintiff of conduct issues when all defendants herein violated laws and policies. DOES 1-2 violated security issues and professionalism by coming to an event that they were not invited to with the alleged intention to set up Plaintiff. Plaintiff also sent a letter to the Commissioner of the NYC DOF informing him of the set-up that was used as a pretext for Plaintiff's illegal termination. Plaintiff was extremely humiliated and was not even afforded the opportunity to send a notification to her clients. SIMPSON did not allow Plaintiff to close out

53

expense reports and told her to make an appointment to come back to get her things. Despite Plaintiff's health condition, SIMPSON made a point to stress several times that Plaintiff's medical insurance would cease effectively immediately. Plaintiff was not given her owed vacation pay and had to contact Defendants afterwards to request it.

220.    Plaintiff was treated like a cold hearted criminal and escorted off the property. Plaintiff's termination was not conducted in accordance to the law in that Plaintiff was not in violation of any policies and had no verified or signed warnings on file.

Plaintiff has suffered and continues to suffer extreme emotional distress from the aforementioned losses through this complaint.

## AS AND FOR THE EIGHTH CAUSE OF ACTION
### Breach of Contract

221.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1-220 inclusive of this Complaint, with the same force and effect as though herein fully set forth herein.

222.    Defendants violated Plaintiff's rights pursuant to Breach of Contract. Plaintiff was hired to perform duties in her job description and consistently exceeded expectations. Defendants failed to follow procedures in their Employee Handbook and human resources policies, which in this case is a breach of contract.

## PRAYER FOR RELIEF

As a result of Defendant's acts, plaintiff suffered, and is entitled to damages sustained to date and continuing in excess of eleven million dollars ($11,000,000.00) as well as punitive damages,

costs and attorney's fees.

An order granting such other legal and equitable reliefs as the court deems just and proper.

## **TRIAL BY JURY IS DEMANDED**

Dated: Yonkers, New York
June 1, 2017

Lenora Kinchen
Pro Se
123 Valentine Lane, Apt. 3B
Yonkers, N.Y. 10705
929.389.4440